IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

| | |
|---|---|
| SUSAN THAYER,<br>Qui Tam Plaintiff/Relator<br><br>ON BEHALF OF HERSELF AND ON BEHALF OF THE UNITED STATES OF AMERICA AND THE STATE OF IOWA,<br>    Plaintiff,<br><br>v.<br><br>PLANNED PARENTHOOD OF THE HEARTLAND, INC. (f/k/a PLANNED PARENTHOOD OF GREATER IOWA, INC.),<br>    Defendant. | Case No. 4:11-cv-00129<br><br><br><br>DEFENDANT'S RESISTANCE TO PLAINTIFF'S SECOND MOTION TO COMPEL PRODUCTION OF DOCUMENTS |

Plaintiff's second Motion to Compel is as over-reaching as the first. In this Motion, Plaintiff seeks, among other things, the production of every Medicaid patient billing record from 2006 to 2008 regardless of the service provided. Granting this Motion would result in over 400,000 patient billing records produced to Plaintiff that have absolutely no nexus to this litigation. Plaintiff's only basis for this broad request is unsupported speculation that PPH must be hiding information, based on unpled claims that PPH was keeping two sets of patient ledgers or otherwise engaging in questionable billing practices. But there are only two remaining claims in this litigation: (1) whether Defendant Planned Parenthood of the Heartland, Inc. ("PPH") wrongfully dispensed contraception prior to the order of a physician or other authorized practitioner; and (2) whether PPH fraudulently submitted claims for reimbursement to Medicaid in conjunction with the provision of abortion services. It is axiomatic that discovery in this case should be limited to those claims and those patient services. Accordingly, Plaintiff's Second Motion to Compel should be denied.

As an initial matter, Plaintiff's second Motion to Compel states that it seeks to compel production of documents under seven separate document requests (Nos. 5, 6, 12, 17, 18, 25 and 44).[1] However, Plaintiff's Motion further states that "Plaintiff at this time only seeks the requested billing records and data." (Pl's Br. in Support of Second Motion to Compel Production of Documents ("Memo"), Dkt. 140 at 13.) The four categories of billing records and data addressed in Plaintiff's Motion include:

   a. All raw data relating to all billings to Iowa Medicaid during the relevant time period (with patient names redacted) (Plaintiff's Request No. 44);

   b. The last four (4) numbers of each patient's social security number in order to permit Plaintiff's experts to better link up the charges and look for instances where two different ledgers are being utilized;

   c. Diagnosis code; and

   d. Provider name and number.

(Memo at 8.) During the parties' April 12, 2017 telephonic status hearing with the Court, Plaintiff agreed that her second Motion to Compel would be limited to those billing records sought in Plaintiff's April 3, 2017 letter to PPH.[2] That letter only sought the above four categories of billing records and data. (Ex. B to Pl's Second Motion to Compel ("Motion"), Dkt. 140.) Similarly, the meet-and-confer between the parties that preceded this Motion only addressed those four categories of data. Accordingly, PPH limits this Resistance to the four categories of billing data detailed above. To the extent Plaintiff's Motion demands "that the Court order the production of the documents requested by Plaintiff in Request Nos. [] 5, 6, 12,

---

[1] On their face, these document requests are much broader than patient billing data and include, among others, patient medical records that were addressed in Plaintiff's first motion to compel. (Dkt. 120, 121.)

[2] The limited scope of the Motion was discussed and agreed upon with the Court due to the accelerated briefing and argument schedule and a conflict with the date of oral argument involving counsel for PPH.

17, 18, 25 and 44" (Memo at 14), PPH respectfully requests the broader demand be denied outright.

I.   **Legal Standard**

Plaintiff's Motion is premised on a misconception of the current state of the law governing discovery in federal court. Plaintiff's Motion re-states the old version of Rule 26 and cites only to cases relying on the prior discovery standard under the old Rule. (Memo at 1.) But Rule 26 was updated effective December 1, 2015. No longer is it sufficient for Plaintiff to claim the discovery requested "appears facially relevant," to justify an overbroad examination into more of PPH's billing records. (*Id.*)

The revised Rule 26(b) now permits discovery:

> [R]egarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the party's resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1); *see also Design Basics, LLC v. Ahmann Design, Inc.*, No. C16-0015, 2016 WL 4251076, at *4 (N.D. Iowa Aug. 10, 2016) ("As made clear by the recent amendment to Rule 26(b)(1), discovery must be proportional to the needs of the case."); *In Re Tier 1 JEG Telecommunications Cases*, No. 4:07-CV-00043, 2016 WL 7508831, at *1 (S.D. Iowa July 14, 2016) (The discovery process "is now expressly cabined by the amended rule's requirement of proportionality.")

The purpose of the revisions is to assure that "the pretrial process . . . provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery. The key here is *careful and realistic assessment of actual need*." Chief

Justice John Roberts, 2015 Year–End Report on the Federal Judiciary [3] at 7 (emph.added); *see also Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307 (S.D. Ind. 2016) ("Rule 26's expression of the scope and limits of discovery has evolved over the last thirty years or so.  Each time the language and/or structure of the "Discovery Scope and Limits" section of the rule was changed, it was to rein in popular notions that anything relevant should be produced and to emphasize the judge's role in controlling discovery.").

In a qui tam action under the False Claims Act ("FCA"), a plaintiff-relator is not entitled to receive all information related to every financial exchange between the defendant and the government based on an "information-and-belief" approach in the complaint, because those allegations lead to "broad and burdensome discovery."  *See U.S. ex rel. Jacobs v. CDS, P.A.*, No. 4:14-CV-00301, 2016 WL 4146077, at *4 (D. Idaho Aug. 3, 2016) ("[A] relator is supposed to be an insider, one who advances claims she knows about because of her unique position that the government does not know.  Moreover a qui tam action is not a roving commission to investigate all the financial dealings of the defendants." (quotation omitted)); *see also U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359-60 (11th Cir. 2006) (finding it is especially important in FCA cases to impose "manageable discovery limits" tied to the *particular* allegations plead with specificity as required by Rule 9(b)); *United States v. Am. Intercontinental Univ., Inc.*, No. 1:08-CV-2277, 2012 WL 12878365, at *1 (N.D. Ga. Jan. 20, 2012) (It is "especially true" in qui tam cases that discovery "must be limited and tailored to the specificity of the complaint.").

Here, the requested discovery is not proportional to the needs of the case because it is overbroad and fails the basic relevance standard.  Plaintiff's motion should be denied.

---

[3] Found at www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf.

## II. Background

### A. Litigation History and Remaining Claims.

The history of this litigation is well-known to the Court, and PPH will not re-visit the full history here.[4] In summary, the District Court initially granted PPH's motion to dismiss the entire Third Amended Complaint ("TAC") pursuant to Rule 9(b) because Thayer failed to allege a single representative example of a fraudulent claim. However, on appeal, the Eighth Circuit only partially affirmed the dismissal and remanded the remaining claims for further consideration under Rule 12(b)(6). *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917-20 (8th Cir. 2014). In his July 21, 2016 decision on PPH's subsequent motion to dismiss under Rule 12(b)(6), Judge Jarvey dismissed, in part, Count I, denied PPH's motion to dismiss Count II and dismissed Count III. (Dkt. 85 at 30.)

In Count I, the only remaining claim is Plaintiff's allegation "that Defendant issued prescriptions without or prior to authorization by a licensed practitioner." (Dkt. 85 at 30.) Plaintiff alleges that clinic personnel dispensed contraception to PPH clinic patients when no qualified practitioner was present and the prescription was later approved by the qualified practitioner. PPH maintains that its provision of contraceptives is justified under its physician standing order, which is allowed as a reasonable interpretation of Iowa Code § 147.107(7).[5] The Court has yet to consider whether the standing orders themselves are a basis for dismissing the claim.

---

[4] PPH incorporates by reference the history and background of the litigation as discussed in detail in PPH's Resistance to Plaintiff's First Motion to Compel. (Dkt. 121.)

[5] A reasonable interpretation of a regulatory scheme cannot form the basis of a FCA violation for a knowingly false claim. *See, e.g., Ketroser v. Mayo Foundation et al.*, 729 F.3d, 825, 832 (8th Cir. 2013) ("Mayo's reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA"); *Hixson v. Health Management Systems, Inc.,* 613 F.3d 1186, 1190 (8th Cir. 2010) ("[A] reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute.").

Count II concerns PPH's abortion-related billings. Plaintiff alleges that PPH improperly billed Medicaid for services and supplies related to the provision of abortions by "unbundling" or "fragmenting" the billing of such abortion-related services such that the related service's connection to an abortion was not disclosed with PPH's request for reimbursement. (TAC ¶¶ 98, 102-03.) Judge Jarvey held that the "degree to which the alleged services were covered as services that would have been performed regardless of patient's ultimate decision to obtain an abortion" was a fact question and could not be resolved on a motion to dismiss under Rule 12(b)(6). (Dkt. 85 at 28.)

### C. Discovery History Concerning Billing Records.

Plaintiff served her First Requests for Production on October 11, 2016. (Motion at ¶ 3.) PPH served its responses and objections on November 16, 2016. (*Id*.; Ex. A to Motion.)

On December 22, 2016, PPH produced patient billing records related to the remaining abortion-related claim in Count II.[6] (*See* Ex. B.) PPH produced an excel spreadsheet (Bates-labeled PPH00554) containing 21,796 patient billing records, which included electronic billing records for any patient that received abortion services from PPH during the relevant time period and also had *any service* paid by Medicaid during the relevant time period. (*See id*.) For all patients identified as receiving abortion services and any Medicaid payment for services, PPH produced *all* electronic billing records reflecting *all* payments PPH received for that patient during the relevant time period, including all Medicaid payments, payments from third-party insurers and self-pay records. Along with its production, PPH provided a detailed cover letter explaining the specific billing records included in the production and further produced two data tables explaining various fields included in the records. (*See id.*)

---

[6] The produced electronic billing records were prepared from data PPH originally exported and preserved, in 2011 after this lawsuit was filed, from its now-discontinued structured database system FamPlan 2000. (*See* Ex. A, Decl. of D. Larson.)

On January 24, 2017, this Court heard argument on Plaintiff's first Motion to Compel (Dkt. 120) concerning Plaintiff's request for all patient files and medical records concerning each oral contraceptive prescription issued during the relevant time period. Following oral argument, during the parties' continued negotiations concerning these discovery disputes, PPH agreed to produce billing records for all contraceptive prescriptions paid by Medicaid during the relevant time period.

On February 17, 2017, PPH produced an excel spreadsheet (Bates-labeled PPH03957), containing 101,844 billing records for contraceptive prescriptions paid by Medicaid during the relevant time period. (*See* Ex. C.) Along with its production, PPH provided a detailed cover letter explaining the specific billing records included in the production. (*See id.*)

On April 3, 2017, Plaintiff sent PPH a letter following Plaintiff's expert's "preliminary evaluation of the abortion claims data" produced in December 2016, identifying alleged data discrepancies and categories of data Plaintiff found to be "incomplete," and requesting that PPH produce all raw data relating to all billings to Iowa Medicaid during the relevant time period, with partial social security numbers, diagnosis codes and provider names and numbers. The parties discussed the issues raised by this letter with this Court during the April 12, 2017 telephonic status hearing, at which point the Court directed that: (1) PPH would serve Plaintiff with amended discovery responses identifying specific objections and clarifying responses based on PPH's productions to date and continuing investigation; and (2) Plaintiff would file a limited motion to compel based on the April 3rd letter by May 1, 2017.

On April 25, 2017, PPH served Plaintiff with Amended Responses and Objections to Plaintiff's First Requests for Production. (*See* Ex. D.) On April 28, 2017, PPH provided follow-up correspondence detailing additional data fields available in the raw billing data PPH archived from the FamPlan 2000 system, but were not produced as they were duplicative or irrelevant. (*See* Ex. E; *see also* Ex. 1 to Decl. of D. Larson (Ex. A).) PPH did offer to re-run the billing data

productions to include these data fields, but Plaintiff has not responded to the offer. None of these data fields are at issue in this Motion.

## III. The Patient Billing Record Data Sought by Plaintiff is Not Relevant, Not Proportional or Not Available.

Plaintiff's Motion is replete with allegations of wrongdoing against PPH supported only by conjecture and speculation.[7] Such speculation cannot be the basis for discovery, which by rule is limited to the claims in this case. PPH focuses its Resistance on the four categories of patient billing data that Plaintiff seeks to compel in this Motion.

### A. All Patient Billing Records.

Plaintiff seeks to compel production of *all* patient billing records for payments made by Medicaid to PPH from 2006 to 2008 – without any limitation. If granted, Plaintiff would be given access to hundreds of thousands of patient billing records that are wholly irrelevant to the two claims remaining in this case. This request should be denied because it necessarily includes irrelevant information and is not proportional to the needs of the case.

Plaintiff states that it is necessary to compel production of all billing records "so that PPH cannot pick and choose what information it believes to be relevant." (Memo at 4.) This justification is both unfounded and ill conceived. PPH was fully transparent with Plaintiff regarding the parameters used to cull the billing data and run the produced reports. (*See* Exs. B and C.) The attached Declaration of Dan Larson further details and attests to the process used to archive the billing data and run the queries that resulted in the billing record productions. (*See* Ex. A.) To reiterate, with regard to the abortion-related claim, PPH produced 21,796 patient billing records. To collect those records, PPH first identified all patients that received abortion

---

[7] Plaintiff's Motion and supporting exhibits also contain numerous substantive allegations of wrongdoing by PPH that have nothing to do with the Court's consideration of this discovery motion. PPH hereby asserts a standing objection to these allegations and will refute these allegations at the appropriate time, which this Motion to Compel is not.

services from PPH during the relevant time period and also had *any service* paid by Medicaid during the relevant time period. (*See* Ex. A at ¶ 14, Ex. B.). For those identified patients, PPH produced *all* electronic billing records reflecting *all* payments PPH received for that patient during the relevant time period, including all Medicaid payments, payments from third-party insurers and self-pay records. If there is any basis for Plaintiff's claim in Count II that PPH wrongfully billed Medicaid for abortion patients, Plaintiff has the information she needs to determine that. With regard to the contraception claim, PPH produced 101,844 billing records for *all* contraceptive prescriptions paid by Medicaid during the relevant time period. PPH did "pick and choose" which billing records were relevant to the claims in this case – and told Plaintiff exactly what it chose and how it picked them. That is how discovery works.

Plaintiff then alleges PPH is lying about its production[8] by withholding responsive records, citing statistics from PPH's public disclosures. This is a serious allegation that PPH does not take lightly, advanced only on the basis of rank speculation. Plaintiff states that PPH "likely provided a minimum of 12,000 medical and surgical abortions" during the relevant time period but takes issue with the fact that PPH produced billing records for only 1,970 abortions. (Memo at 5.) The reason for the discrepancy is clear: PPH only produced billing records for patients that received an abortion service *and* had any service paid by Medicaid. Many women come to PPH only to receive abortion services which Medicaid does not cover, and do not receive other services covered by Medicaid. Conversely, PPH provides numerous healthcare services to Medicaid patients (such as annual exams, treatment for sexually transmitted diseases, contraception prescriptions, etc.) and many of those patients may never receive abortion services. Per the statistics advanced by Plaintiff, the overlap of patients who receive abortion services and

---

[8] A party cannot use a motion to compel as a vehicle to elicit a "different response, because [she] is unhappy with or disagrees with the responses defendant provided. This is not an appropriate use of a motion to compel." *Logan v. Chertoff*, No. 4:07-CV-1948, 2008 WL 3994835, at *1 (E.D. Mo. Aug. 26, 2008).

other healthcare services paid by Medicaid was approximately 16% during the relevant time period. (Memo at 5.) There is nothing nefarious about that reality.

Plaintiff also alleges that either PPH or its counsel must have intentionally tampered with billing data before providing it in the discovery process. (*See* Memo at 6.) Plaintiff relies on the unfounded speculation of her alleged "expert," Ms. Knau Britton, to support this assertion. Ms. Knau Britton cites errors in the data where the date of payment precedes the date of service. (*Id.*) She suggests that these errors "reflect possible tampering with of the data." (*Id.*) Again, common sense suggests the opposite. As with any mass quantity of data entry, there are likely to be errors. The billing records produced reflect the data as manually entered by PPH employees at the time services were billed and payments received. Dan Larson's Declaration further certifies that PPH did not change the substance of any billing record before it was produced. (Ex. A at ¶¶ 15, 17.) To be absolutely clear: neither PPH nor its counsel has "tampered" with the billing data or in any way altered the billing entries before producing them.

Further, Ms. Knau Britton opines that "PPH's production reflects numerous examples of abortion related services being billed [separately] to entities such as insurance companies, while there is an absence of billing [separately] for such services to 'self pay' Medicaid patients." (Memo at 6.) This is not remarkable or at all significant to this case. Insurance companies require individual services to be billed separately, as reflected in the list of abortion-related services that Ms. Knau Britton correctly observed were billed to insurance companies. (*Id.* at 6-7.) When a patient does not have private insurance to cover abortion services, PPH bills the patient for only one bundled charge for the abortion procedure, again as Ms. Knau Britton correctly observes for self-pay situations. (*Id.*) PPH has no obligation to bill individual patients for services the same way it bills insurance companies for services. Again, there is nothing nefarious suggested by these facts. And for all Medicaid patients who paid for their abortions, PPH has provided billing records for all of the Medicaid services paid for that patient.

Finally, Plaintiff cites a statement from Jennifer Jackson, a temporary contract employee who worked at PPH for approximately three months in 2012, well after the relevant time period of 2006 to 2008. (Ex. C to Motion at 25, 45.) Plaintiff claims Ms. Jackson's statement supports Plaintiff's contention that PPH used "separate ledgers of the same patient" that Plaintiff contends have not been identified or produced. But even a cursory review of Ms. Jackson's statement shows that it provides no basis for Plaintiff's "separate ledger" allegations.

As an initial matter, Ms. Jackson's statement should be rejected outright as she has no foundation to testify as to PPH's billing practices from 2006 to 2008 because she did not work at PPH during that time period. When Ms. Jackson later worked at PPH, PPH was using different electronic billing software than it used during the 2006 to 2008 time frame. (*Id*. at 57; *see also* Ex. A at ¶¶ 5-6.)

Further, Ms. Jackson's statement does not support Plaintiff's contention. Plaintiff cites only a small portion of Ms. Jackson's statement in which Plaintiff's counsel suggests that "it would be under a different ledger" and Ms. Jackson agrees. (Memo at 7.) It was Plaintiff's counsel – not Ms. Jackson – that introduced the concept of separate "ledgers." Ms. Jackson's further testimony confirmed that there was no separate ledger. Ms. Jackson stated that the allegedly "unbundled" or "fragmented" bills were recorded in the "same [patient] account . . . it's just different dates of service" and would be recorded in the "same place." (Ex. C to Motion at 57-58.) Ms. Jackson further stated: "It is the same – it is blatant. It is the same account." (*See id.* at 57.) Even if Ms. Jackson's testimony could be considered by this Court (it should not be) and even if the testimony was factually accurate (it is not), PPH produced *all* payment records for *all* dates of service for patients that received abortion services and had any service paid by Medicaid. Ms. Jackson's statement does not justify Plaintiff's Motion to Compel.

Plaintiff's demand for all patient billing records would require production of an extraordinary amount of patient data that has no relevance to Plaintiff's remaining claims. Thus

far, PPH has produced a total of approximately 123,000 patient billing records (including both the abortion patient and contraceptive patient records). The total number of billing records concerning a Medicaid payment for the relevant time period is over 600,000. (*See* Ex. A at ¶ 18.) If all 600,000 patient records were produced, Plaintiff would have needless access to approximately 475,000 irrelevant patient records. For example, any Medicaid patient who sought and received treatment for a sexually transmitted disease would have her billing records produced. Any Medicaid patient who sought and received treatment for an annual pelvic exam would have her billing records produced. Any Medicaid patient who sought and received treatment for a breast cancer screening would have her billing records produced. None of those records have anything to do with this case. Accordingly, Plaintiff's Motion to Compel production of all PPH electronic Medicaid billing records during the relevant time period should be denied.

### B. Portions of Patient Social Security Numbers.

Plaintiff moves to compel production of partial social security numbers for all patients in order to "permit Plaintiff's experts to better link up the charges and look for instances where two different ledgers are being utilized." (Memo at 8.) Plaintiff's only reason for requesting partial social security numbers is her unsupported speculation about PPH's billing practices based on Ms. Knau Britton's statement that certain abortion-related services were not separately billed to self-paying abortion patients (Memo at 6), and Ms. Jackson's statement that "different ledgers" allegedly were used to unbundle and separately bill abortions and abortion-related services (Memo at 7-8). Neither of those statements provide any support for Plaintiff's conjecture that PPH kept two sets of patient ledgers, as shown *supra* at 10-11.

Production of partial patient social security numbers is unnecessary because the billing records produced to Plaintiff include a unique identifying number for each patient. Each patient was assigned only one unique patient identifier in the electronic billing records PPH used during

the relevant time period.  (*See* Ex. F, Decl. of J. Warren-Ulrick at ¶ 4.)  These patient identifiers appear in the billing data produced by PPH.  (*See* Exs. B and C.)  These unique patient numbers were also provided to Medicaid as the "patient account number" when claims were submitted for reimbursement.  (*See* Ex. F at ¶ 7.)

Further, PPH has consistently objected to the production of patient personally-identifying information, as demonstrated by correspondence from PPH to Plaintiff accompanying PPH's productions.  (*See* Exs. B-D.)  PPH maintains its objection to producing confidential patient information, including partial social security numbers, and further incorporates its arguments from PPH's resistance to Plaintiff's first motion to compel.  (*See* Dkt. 121.)

Here, the last four digits of patients' social security numbers will provide no better means to "link up charges" than already has been provided by the production of the unique identifying number assigned to each PPH patient.  The Court should deny this request.

### C. Diagnosis Codes.

Plaintiff seeks to compel PPH to produce "diagnosis codes"[9] with the patient billing records.  This information is unnecessary because PPH produced CPT (Current Procedural Technology) Codes that describe the treatment or procedure provided to the patient with every patient billing record.  (Ex. A at ¶ 9; *see also* Exs. B and C.)  While Plaintiff summarily asserts that her "expert" needs the diagnosis code to determine whether specific abortion-related services were fragmented or unbundled, Plaintiff fails to explain why the CPT codes are insufficient.

Importantly, "diagnosis code" information does not exist in PPH's archived form of the raw billing data.  (Ex. A at ¶¶ 8-10; *see also* Ex. E.)  In order to produce the diagnosis codes

---

[9] Based on the characterization of the "diagnosis code" in Plaintiff's Motion, PPH presumes Plaintiff is seeking the International Statistical Classification of Diseases and Related Health Problems or "ICD-9" code.

requested, PPH would have to access the archived version of the FamPlan database application, use the application's report-writing software module to extract the data requested, and prepare a new report with the diagnosis codes included following the same search parameters as the billing data previously produced. (*See* Ex. A at ¶¶ 7, 10, 19.) PPH anticipates re-producing the billing records to include the diagnosis code would cost approximately $500 to $1000 based on the time and rate estimates of PPH's contracted report writer. (*Id*. at ¶¶ 1, 19.) While PPH asserts that the diagnosis codes are not relevant to Plaintiff's claim, PPH would be willing to re-produce the contraceptive and abortion billing records with the diagnosis code information at Plaintiff's expense.

### D. Provider name and number.

Finally, Plaintiff seeks the provider name and number for all of the abortion-related and contraceptive billing records. As an initial matter, no provider numbers[10] exist in any of PPH's electronic billing data from 2006 to 2008 so this request must be limited to the provider names. (Ex. A at ¶ 11; *see also* Ex. E.) Plaintiff correctly notes that the provider name was provided in the contraceptive billing data, but not the abortion-related billing data. PPH agreed to produce the provider name with the contraceptive billing records because the related claim challenges whether the prescription was properly prescribed by a provider. The abortion claim has nothing to do with who provided the abortion services. Further, there are valid privacy concerns for the providers of abortion services. *See, e.g. Planned Parenthood Arkansas & E. Oklahoma v. Jegley*, No. 4:15-CV-00784, 2016 WL 7487914, at *2 (E.D. Ark. Feb. 1, 2016) (collecting cases) ("There is support in the case law" for protecting the identities of abortion providers who may be "subject to personal and professional stigma.").

---

[10] PPH presumes Plaintiff's reference to a "provider number" refers to the National Provider Index number or "NPI" number.

Tellingly, Plaintiff offers no justification for this request. By misconstruing a prior Court order, Plaintiff seemingly argues that this Court already found that the identity of abortion providers is not subject to any confidential considerations (Memo at 12), but this Court has neither considered nor decided that issue. Plaintiff's only other explanation for this demand is a single sentence stating that it "seems obvious there is no way for Plaintiff to assess abortion claims information produced by Defendant from its service providers and managers without knowing who those individuals were, based on their names and Provider Numbers." (Memo at 12.) Without offering any further explanation or justification for why the provider names are relevant to Plaintiff's abortion-related claim, Plaintiff failed to support her request for this information.

Based on the confidentiality concerns of the providers and the lack of relevance of the data to Plaintiff's abortion claim, this request should be denied.

WHEREFORE, Defendant Planned Parenthood of the Heartland, Inc. respectfully requests that this Court enter an order denying Plaintiff's second motion to compel.

Dated: May 15, 2017                    Respectfully submitted,

/s/   Tiffany Amlot
Alan S. Gilbert, *pro hac vice*
Tiffany L. Amlot, *pro hac vice*
Kristen C. Rodriguez, *pro hac vice*
Dentons US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL  60606
Telephone:  312-876-8000
Facsimile:  312-876-7934
alan.gilbert@dentons.com
tiffany.amlot@dentons.com
kristen.rodriguez@dentons.com

Stanley J. Thompson
Jonathan C. Wilson
Davis Brown Koehn Shors & Roberts PC
215 10th Street, Suite 1300

Des Moines, IA 50309
Telephone: 515 288 2500
Facsimile: 243 0654
StanThompson@davisbrownlaw.com
jonathanwilson@davisbrownlaw.com

## CERTIFICATE OF SERVICE

I, Tiffany L. Amlot, an attorney, hereby certify that on May 15, 2017, I electronically filed **DEFENDANT'S RESISTANCE TO PLAINTIFF'S SECOND MOTION TO COMPEL PRODUCTION OF DOCUMENTS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/  Tiffany Amlot